HD
RECEIVED
MUNICIPAL ATTORNEY
06 JUN 20 PM 3:31

## PURCHASE AND SALE AGREEMENT
### (MOA-Mann Lieser Muldoon Estates)

Purchase and Sale Agreement ("**Agreement**") dated the 9th day of January, 2006 ("**Effective Date**"), between Joe Bryant and Nada Mae Mortenson, as conservator of the Estate of Thomas Michael Cody IV (collectively, "**Seller**"), and the Municipality of Anchorage ("**Buyer**").

1. <u>Sale and Purchase.</u> Seller shall sell and Buyer shall purchase, subject to the terms and conditions in this Agreement, the following described tract of land containing approximately 522,720 square feet (approximately 12 acres), described as:

    The East 12 Acres, Tract B, Muldoon Estates Subdivision, Plat No. 71-113, located in the NE ¼, Section 24, T13N, R3W, Seward Meridian, Anchorage Recording District, Third Judicial District, State of Alaska ("**Property**").

2. <u>Purchase Price.</u> The purchase price ("**Purchase Price**") for the Property shall be One Million Three Hundred Seven Thousand Dollars ($1,307,000), which may be adjusted for any variation in square footage from that specified in Paragraph 1.

3. <u>Payment of Purchase Price.</u> The Purchase Price shall be payable in the following manner:

    a. <u>Earnest Money.</u> Within two business days after execution of this Agreement by both parties, Buyer shall deposit Five Thousand Dollars ($5,000) in earnest money into a trust account at Stewart Title of Alaska ("**Title Company**"). At closing ("**Closing**"), as described in Paragraph 12, the earnest money shall be credited against the Purchase Price. Except as otherwise provided herein, Buyer is entitled to a full refund of the earnest money until Seller records a plat creating the tract described above as the Property.

    b. <u>Balance of Purchase Price.</u> The balance of the Purchase Price, One Million Three Hundred Two Thousand Dollars ($1,302,000), at the square footage listed above, shall be payable by Buyer at Closing.

4. <u>Due Diligence; Standstill.</u> Buyer shall have 90 days from the Effective Date of this Agreement to complete any due diligence review ("**Due Diligence**") it wishes to make on the Property. The opportunity of Buyer to make such reviews and/or actually making such reviews shall in no way diminish the liability of Seller for the representations, warranties, and indemnities of

Seller in this Agreement or constitute a defense to Seller on such representations, warranties, and indemnities in the event of a breach, all of which provisions shall survive Closing as provided in Paragraph 11.

Buyer's Due Diligence may include, at Buyer's sole discretion, any and all issues, concerns, questions, investigations, examinations, and reviews regarding the Property it wishes to make, including any improvements Buyer may intend or contemplate making on or to the Property, and may include, but is not limited to, the items listed in subparagraphs *a.* through *n.* below. In addition, Seller shall, within ten days of the Effective Date of this Agreement, provide Buyer with the materials and items described in subparagraphs *a., b., f., g., h., i., j., k., l., m.* and *n.* below for review, if such materials or items are in the possession of or reasonably available to the Seller:

a. Any existing as-built or other surveys;
b. Any existing plats;
c. Current zoning and any information regarding possible zoning changes;
d. All covenants, conditions, and restrictions on the Property;
e. Any pending or final assessments of any type whatsoever;
f. Preliminary Commitment for Title Insurance, exceptions, and underlying documents, all of which are subject to Buyer's approval;
g. Any and all materials and reports relating to zoning, covenants, conditions, and restrictions, right-of-ways, availability of and presence of utilities, easements, and Property set backs;
h. Any and all reports, inspections, or reviews pertaining to the Property or adjacent properties, including environmental, soils, and geotechnical assessments, whether in the possession of the Seller or Seller's Agents and/or performed pursuant to this Agreement;
i. Any and all information contained in the files of the Alaska Department of Environmental Conservation regarding the Property;
j. Any and all existing or claimed lease or rental agreements currently in effect, including all addenda, amendments, and options;
k. Contracts and documentation for previous construction, improvements, installations, filling, excavations, grading, repairs, and maintenance performed on the Property;
l. Any inspection reports relating to the Property;
m. Any and all records relating to use of storage tanks, utility, and distribution lines, asbestos, PCBs, batteries, chemicals, and other Hazardous Materials that may have been or are currently located on the Property; and
n. Any other information deemed pertinent by or requested by Buyer.

Property shall be taken off the market and Seller or its agents shall not

negotiate for the sale or lease of this property during the 90-day Due Diligence period. Sellers shall cooperate with Buyer in providing access, any knowledge, and information as may be necessary to complete investigations on the property.

If Buyer, in its sole discretion, rejects the Property by written notice to the Seller, copied to the Title Company, for any reason whatsoever prior to the expiration of the Due Diligence period, Title Company shall, upon receipt, refund all earnest money to Buyer without further consent or notice to Seller, and this Agreement shall terminate and be of no further force or effect to the parties. If Buyer makes no objection at the expiration of the Due Diligence period, Buyer shall be deemed to have accepted the Property.

5. <u>Right of Entry Prior to Closing</u>. Prior to Closing, and without further notice to Seller, the Buyer, Buyer's employees, consultants, and agents, shall have reasonable access to the Property for the purpose of conducting Due Diligence investigations, including taking samples, borings, geotechnical examinations, environmental examinations, and all other actions necessary or appropriate to complete the Due Diligence review.

Buyer shall indemnify and hold Seller harmless from all loss or damage Seller may suffer arising from any acts or omissions of Buyer, or Buyer's authorized employees, contractors, and agents, while upon the Property to conduct Buyer's Due Diligence.

6. <u>Representations and Warranties</u>. Seller represents and warrants to Buyer that:

   a. During Seller's period of ownership, from the date of Seller's acquisition of the Property to the date of Closing under this Agreement ("Period of Ownership"):

      i. there have not been any apparent or latent defects created or resulting in or on the Property;
      ii. there has been no Release of Hazardous Substances (as those terms are defined in Paragraph 8) on, in, under, onto from offsite sources, or from the Property;
      iii. there have not been any underground or above ground storage tanks on the Property, whether in service or closed, abandoned, or decommissioned and no underground or above ground storage tanks have been removed in a manner not in full compliance with applicable federal, state, and local laws, regulations, and requirements;

iv. there have been no known, pending, or threatened environmental claims, law suits, agency proceedings, or other legal or administrative challenges concerning the Property, the operation of the Property, or any condition on the Property, and Seller has no knowledge (and no information which would put Seller on notice) of any such claim, litigation, proceeding, or challenge proposed or threatened by any person or entity, or otherwise anticipated by Seller;

v. there have been no Hazardous Substances on or in the Property, whether contained in barrels, tanks, equipment (moveable or fixed), or other containers, deposited or located in land, waters, sumps or in any other part of the Property, incorporated into any structure on the Property; or otherwise existing on the Property;

vi. the Property (and, to the best of Seller's knowledge, the adjacent property or other nearby property) has not been used for any industrial or commercial operation involving any Hazardous Substances including any sort of manufacturing, processing, or refining equipment, machinery, part or component, cleaning or degreasing; the sale, storage or transport of Hazardous Substances; providing of services which utilize Hazardous Substances; drilling, mining or production of oil, gas, minerals or other naturally occurring products; or any agricultural activities involving the use or storage of fertilizers or pesticides;

vii. there have been no spills, discharges, releases, fills, deposits or emplacements of any Hazardous Substances on or near the Property;

viii. no tanks, trucks or other vehicles containing Hazardous Substances have been loaded or unloaded on the Property;

ix. there have been no asbestos-containing materials or lead paint installed in or affixed to any structure on the Property, nor have such materials been stored or disposed of anywhere on the Property;

x. there have been no electrical transformers, fixtures, or other electrical equipment containing PCBs or other Hazardous Substances installed in, affixed to, or located on the Property;

xi. there have been no civil or criminal proceedings or investigations instigated at any time or now pending, nor have any notices, claims, demands, or orders been received, arising out of any violation or alleged violation of, or failure to comply with, any federal, state, or local law, regulation, or requirement applicable to the Property or its use, nor do any

                facts or circumstances exist that Seller might reasonably expect to form the basis for any such proceedings, investigations, notices, claims, demands, or orders;

      xii.    all improvements to the Property including utilities, have been installed and constructed in compliance with all applicable laws and pursuant to valid permits; and

      xiii.    the Seller and the Property has been in full compliance with all federal, state, and local laws, regulations, and requirements applicable to the Property and its use including health, safety, environmental, zoning, and land use laws.

b.     Seller has no knowledge of any structures or improvements on adjoining property which encroach onto the Property, nor any knowledge of structures or improvements on the Property which encroach onto adjoining property; and

c.     Seller has no knowledge of any easement or other interest in the Property other than those that appear of record.

If Seller discloses in the affirmative to any one or more of the prior subparagraphs, such disclosure(s) is detailed with specificity and signed by Seller, on **Appendix A** hereto.

(Buyer's initials)    (Seller's initials)

7. Indemnity:

   a. Seller shall defend, protect, hold harmless, and indemnify Buyer from and against any and all losses, claims, damages, penalties, fines, investigations, assertions, liens, demands, and causes of action of every kind and character arising out of or related to an Environmental Event.

   b. Seller's obligations to defend and indemnify shall include, without limitation, the obligation to undertake any remediation project, and to undertake the defense of any and all costs of removal action, remedial action, other "response costs" (as that term is defined under applicable federal state and local law), reasonable attorney's fees, penalties, fines, damages, interest, and administrative/court costs incurred by the Buyer in response to and defense of such regardless of the basis of liability alleged by or against any party, including strict liability under AS 46.03.822 or federal law. In the event Buyer is required to undertake any actions to remedy any environmental contamination or release of Hazardous Substances on the Property as a result of an Environmental Event, then Seller shall reimburse and indemnify Buyer for all costs and expenses incurred in doing so, including legal fees, costs of consultants and contractors, civil penalties, and other costs incurred as a result of the remediation of or response to any action, proceeding, or other claim related to the Property.

8. Definitions. The following terms are defined as follows for purposes of this Agreement:

   a. ***Environmental Event*** shall mean any assertion or claim made against the Buyer or any department, division or agency of it, Seller or any third party by any government agency or third party alleging the Release of Hazardous Substances or environmental contamination of any kind on or in connection with the Property that have arisen from activities occurring directly or indirectly in connection with the Property during the Period of Ownership, as defined in Paragraph 6, as well as the personal injury or loss to persons caused by:

      (1)    the presence of Hazardous Substances on the Property resulting from events, actions or inactions during the Period of Ownership; or

      (2)    the migration to adjacent properties, either before or after the Closing Date, of a Release of Hazardous Substances or environmental contamination of any kind on or in connection with the Property during the Period of Ownership.

b.    ***Hazardous Substance*** shall include

      (1)    pollutants or substances which are or become regulated under any federal, State or local statute, ordinance, rule, regulation or other law now or hereafter in effect pertaining to environmental protection, contamination, or cleanup (including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ["CERCLA"], 42 U.S.C. §§ 9601 *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986, PL 99-499; the Hazardous Materials Transportation Act of 1994, 49 U.S.C. §§ 5101 *et seq.*; the Toxic Substance Control Act, 15 U.S.C. §§ 2601 *et seq.*; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. §§ 6901 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*), and in the rules and regulations adopted and guidelines promulgated pursuant to such provisions, which are defined as "hazardous waste," "hazardous substances," "hazardous materials," "pollutants," "contaminants," or "toxic substances";

      (2)    substances controlled by the laws of the State of Alaska as hazardous substances, petroleum products, waste or materials, including those defined in AS 46.03.826(5) and AS 46.03.900(9); and

      (3)    asbestos-containing materials or any petroleum products or derivatives.

c.    ***Release*** shall mean releasing, spilling, leaking, pumping, pouring, flooding, emitting, emptying, discharging, injecting, escaping, leaching, disposing, or dumping, whether directly onto the Property or flowing onto the Property from offsite sources.

9.    <u>Conditions to Obligation of Buyer to Close on Purchase.</u> The obligation of the Buyer to close on this Agreement is expressly contingent on the

following:

a. The Property is in the same physical condition at time of Closing as it is at the time of execution of this Agreement;
b. The property appraisal meets or exceeds the purchase price;
c. Buyer has approved the preliminary Commitment for Title Insurance, all underlying documents related to the preliminary Commitment for Title Insurance, the title to the Property, and the title insurance policy proposed to be issued at Closing;
d. The Seller has subdivided and re-platted the Property, at Seller's expense, and has recorded the plat creating the Property;
e. The purchase meets all Municipal Charter and Code requirements, and acquisition has been approved by the Anchorage Parks and Recreation Commission and the Anchorage Assembly;
f. All representations, warranties, and agreements made by Seller in this Agreement and in the Closing documents are true as of the time of Closing; and
g. There is no legal action filed or known to either party to be threatened against the Property, the Buyer, or the Seller with regard to the Property or this transaction.

10. Title Insurance and Deed. As a condition to Closing, the Title Company shall be able and willing to issue to Buyer title insurance in the amount of the Purchase Price and insuring marketable title to the Property, subject to no exceptions other than those Buyer specifies in writing to be acceptable (**"Permitted Exceptions"**). At Closing, Seller shall convey to Buyer by warranty deed, in form and substance acceptable to Buyer, marketable fee simple title to the Property, free and clear of any and all encumbrances, subject only to Permitted Exceptions. At Closing, Seller shall provide, at Seller's expense, a Standard Form Owner's Title Insurance Policy (**"Policy"**) issued by Title Company, insuring marketable fee simple title to Buyer in the full amount of the Purchase Price and containing no exceptions or conditions other than the Permitted Exceptions.

11. Survival. All representations, warranties, and indemnities of Seller in this Agreement or in Closing documents shall survive Closing and shall not be deemed to have merged into the Closing documents nor in any way terminated, released, or waived by reason of the Closing or execution of the Closing documents.

12. Closing. Closing and recording shall occur on or before 30 days from Buyer's waiver or satisfaction of all conditions set forth in this Agreement including the conditions specified in Paragraph 9 and title matters and

contingencies specified in Paragraph 10, but no later than <u>April 15, 2006</u> ("**Closing Date**"). Buyer shall have the right to extend the Closing Date for an additional 30 days by providing Seller with written notice of Buyer's election to do so on or before the Closing Date.

13. <u>Closing Costs.</u> The respective parties shall be responsible for and pay the following Closing costs:

    a. Seller shall pay the following Closing costs:

        (1) Seller's own preparation costs for this Agreement;
        (2) All recording and preparation fees for documents required to remove or amend title exceptions to be removed for Closing;
        (3) One-half the recording fees not described in (2) above;

       (4)    Costs of the Preliminary Commitment for Title Insurance and the Standard Form Owner's Title Insurance Policy;
       (5)    Any and all taxes due;
       (6)    Any outstanding or pending assessments;
       (7)    Its own attorney's fees;
       (8)    Its real estate brokerage fees; and
       (9)    One-half the Closing escrow fees.

  b.    Buyer shall pay the following closing costs:

       (1)    One-half the conveyance document preparation fees (not including document preparation fees to remove or amend title exceptions to be removed for Closing) and all its own preparation fees for this Agreement;
       (2)    One-half of all conveyance recording fees (not including recording fees to remove or amend title exceptions to be removed for Closing);
       (3)    Its own attorney's fees;
       (4)    Its real estate brokerage fees, if any;
       (5)    One-half the Closing escrow fees; and
       (6)    That portion of the title policy fee in excess of the cost of the Standard Form Owner's Title Insurance required to obtain an ALTA policy, if Buyer so elects.

14.    <u>Proration.</u> Real property taxes (but not interest or penalties on them), shall not be prorated. All assessments, whether general or special, assessed prior to the Closing Date, including balances payable in installments which are not yet due, shall be paid in full by the Seller before or at Closing. No taxes, penalties, interest, assessments, balances, claims or liens shall remain due on the Property after Closing.

15.    <u>Brokerage Fees</u>. Each party represents and warrants it has not retained any real estate brokers and/or agents acting on its behalf in connection with this transaction. Each party agrees to indemnify and hold each other harmless from and against any claims by any real estate broker and/or agent claiming a commission or other form of compensation for representing and/or acting on behalf of the indemnifying party with regard to this transaction.

16.    <u>Default by Seller</u>. If Closing does not occur as provided herein for any reason other than Buyer's default, Buyer may exercise, at its option, any one or more of the following remedies:

  a.    Require repayment of its earnest money;

      b.     Rescind this Agreement and recover from Seller any and all damages and expenses paid or incurred by Buyer in connection with this Agreement and resulting from Seller's breach; and

      c.     Bring an action for and be entitled to a judgment for specific performance without posting a bond.

17.   Default by Buyer. If Buyer defaults in the performance of any of the terms and/or conditions of this Agreement, Seller may rescind this Agreement and retain the earnest money paid by Buyer, which shall be the Seller's sole remedy in the event of Buyer's breach.

18.   No Assignment. This Agreement may not be assigned by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld.

19.   Notices. All notices and communications required or permitted under the terms of this Agreement or by law shall be in writing and delivered personally to the party intended or shall be sent by U.S. certified mail, postage prepaid and return receipt requested, to the appropriate party at the address specified in Paragraph 20. It is the responsibility of each party to this Agreement to promptly provide any changes of address to the other party for notice purposes; in the event a properly sent notice is returned undelivered, the notice shall nonetheless be effective.

20.   Addresses. For the purpose of notices regarding this Agreement, the addresses of the parties shall be as follows, unless changed by a party in writing:

**BUYER:**

Municipality Of Anchorage
Municipal Manager
P. O. Box 196650
Anchorage, AK 99519-6650

With copies to:

Municipality of Anchorage
Attn: Executive Director
Heritage Land Bank and Real Estate Services
P.O. Box 196650
Anchorage, Alaska 99519-6650

      Municipality of Anchorage
      Attn: Municipal Attorney
      Department of Law
      P.O. Box 196650
      Anchorage, Alaska 99519-6550

      **SELLER:**

      Joe Bryant
      Estate of Thomas Michael Cody IV
      3705 Arctic Boulevard #1816
      Anchorage, Alaska 99503

With copies to:

      Will Sherman, Attorney, ATP, CFI
      645 G Street, Suite 856
      Anchorage, Alaska 99501

21.    Costs and Attorney's Fees. If Buyer or Seller brings any action for relief against the other, declaratory or otherwise, arising out of this Agreement, the prevailing party shall be entitled to all its costs and reasonable attorney's fees.

22.    Time of the Essence. Time is of the essence for performance by the parties under this Agreement.

23.    Entire Agreement and Modification. This Agreement, together with any attachments to it and other documents referenced therein, sets forth the entire agreement and understanding of the parties in respect to the transactions contemplated under this Agreement, and supersedes all prior agreements, arrangements, and understandings relating thereto. No modification of this Agreement shall be effective unless in writing and signed by Seller and Buyer, or their authorized representative(s).

24.    Successors. All of the covenants, agreements, terms, and conditions contained in this Agreement shall apply to and are binding upon Buyer and Seller, and their respective successors, representatives, heirs, and permitted assigns.

25.    Counterparts and Facsimile Signatures. This Agreement may be executed in counterparts, each of which shall constitute an original, and all of which together shall be deemed a single document. Signatures on this Agreement

forwarded by facsimile are intended to be the equivalent of original signatures, with the original executed Agreement thereafter to be provided promptly to the other party.

*Signatures on next page*

The parties have executed this Agreement as of the Effective Date specified at the beginning of this Agreement.

**BUYER:**
MUNICIPALITY OF ANCHORAGE

By: _____

    DENIS C. LeBLANC, Municipal Manager

**SELLER:**

_____
JOE BRYANT

MICHAEL

_____

Conservator

ESTATE OF THOMAS

CODY IV

By: _Nada Mae Martenson_
                 _Conservator_
Nada Mae Mortenson,

STATE OF ALASKA     )
                               )ss.
THIRD JUDICIAL DISTRICT    )

The above document was acknowledged before me this 27th day of January, 2006 by DENIS C. LeBLANC, Municipal Manager of the Municipality of Anchorage, an Alaska municipal corporation, on its behalf.

_____
Notary Public in and for Alaska
My commission expires: July 27, 2009

STATE OF ALASKA     )
                               )ss.
THIRD JUDICIAL DISTRICT    )

The above document was acknowledged before me this 9th day of January, 2006 by Joe Bryant.



*Shirley Dewhurst*
Notary Public in and for Alaska
My commission expires: 4-1-09

STATE OF MINNESOTA          )
                            )ss.
COUNTY OF ANOKA             )

The above document was acknowledged before me this 4 day of January, 2006 by Nada Mae Mortenson, as Conservator of the Estate of Thomas Michael Cody IV, on behalf of the Estate.

[Notary stamp: DESIREE L. COONS, Notary Public, Minnesota, My Commission Expires January 31, 2008]

_____ Notary Public in and for Minnesota

My commission expires: 1-31-08

G:\mat\open matters\Heritage Land Bank\Purchase and sale agreement for Lieser (Muldoon) parcel.doc